HUGH JOHN COYLE, JR., et al., and HUGH JOHN COYLE, JR., Administrator, Appellants, v. CHARLES STEPHEN COYLE et al., Appellees.

No. 45273.

AUGUST 4, 1941.

G. P. Linville and C. W. Meek, for appellants.

John J. Kintzinger, for appellees.

SAGER, J.—The record is long, nearly thirty-seven pages being devoted to the pleadings alone. It is manifestly impossible, as it is unnecessary, to undertake to give more than the barest outline of the case. It presents the contradictions usually found in cases of this kind. Only familiar and well-established legal principles are involved. Coyle, Sr., and wife, Sarah, were the parents of the seven children involved in this lawsuit. Appellee Kathryn is the wife of the son Charles. The mother of the family died intestate in May, 1929, owning forty acres of land. No administration was taken out on her estate. The father died March 18, 1938. Prior to the execution of the challenged instruments, which were signed and acknowledged on March 4, 1938, he was the owner of 215 acres of land and a considerable amount of personal property. The terms of the deed and bill of sale were so broad as to leave nothing in the name of the father. Nevertheless Charles, Jr., son and one of the appellants, was appointed and qualified as administrator. Thereupon there were filed in the estate claims of Anna S., Sarah Jane, Egedia May, Hugh John and Rose Ann, being all the sons and daughters except the appellee Charles, and Mary Elizabeth Hall who withdrew from the controversy. Some or all of these claims were discussed with claimant's attorney and all were

sworn to before him. Each was based on a consideration thus expressed:

"The undersigned claimant is the owner of an undivided 1/7 of 2/3 interest in the following described real estate: [here follows the description of the mother's forty acres], having inherited such interest May 11, 1929, from her [Sarah Jane Coyle's] mother * * * who died intestate possessed thereof, and which was occupied by the deceased Hugh John Coyle, Sr., her spouse, from May 11, 1929, down to and including March 1, 1938, to the exclusion of this claimant as his co-tenant and with the definite agreement and understanding entered into on or about May 14, 1929, that he would settle with her for the rental value of said real estate for the period beginning May 11, 1929, down to the date of his death at its reasonable rental value."

These claims were allowed by Coyle, Jr., administrator, in language as follows:

"I, * * * being familiar with the facts set forth in the within claim hereby waive notice of time and place of hearing * * * and allow the same for a period of five years under Code Section 10055 * * * and direct the Clerk of the District Court of Dubuque County, Iowa, to enter my allowance of said claim and judgment therefor on the proper claim records of his office * * *."

The amount allowed was $114.28 and the approval by the administrator leaves open for contest the balance of the claim which was in the sum of $205.71, for nine years rent at $6 per acre.

It is not asserted that there was fraud, mistake or misunderstanding in the filing of these claims. In fact the attitude of the claimants is thus expressed by one of them:

"I swore to that [the claim] and I read it before I swore to it, at the time I swore to it everything therein was true and, everything therein is true now."

These claims appear to be opposed to and inconsistent with the contentions appellants make now. The petition charges that Coyle, Sr., made a contract with each of his children sep-

arately whereby, in consideration of the use of the mother's forty acres for the rest of his life, he would leave his estate to his children share and share alike. These contracts were oral and each was heard by one or the other who would have been incompetent under section 11257, 1939 Code, had not she or he providently abstained from taking any part in the conversations. The filing of these claims is thus explained in appellants' brief:

"* * * said claims as were filed were filed under the provisions of Code Section 10055 and were filed in an effort to protect the rights of the claimants under said Section to the rental value of said lands, should it be determined that the deceased, Hugh John Coyle, Sr., had been legally alienated of the real estate involved in this suit by virtue of the alleged warranty deed purported to have been executed by him * * *."

Appellants argue that under this section there is no inconsistency between the claims filed and the demands now made. But it is difficult to see how this section can reconcile the father's alleged agreement that he would pay rent to the end of his life, with an express contract that if he could have the use of the land rent free, he would leave all his property to the children share and share alike. However the matter may be looked upon, it is quite apparent that the trial court might well have considered this of weight in determining the good faith of appellants' claims.

The petition of appellants, in addition to allegations already noted, charges that the appellees plied Coyle, Sr., with whiskey with the purpose and intent of weakening his mentality and making him more readily amenable to their importunities and influence. We find no support for this charge. He was given whiskey in eggnog or in water at the direction of his physician and the testimony wholly excludes the idea that he was at any time in a besotted condition. He was a man seventy-five years old, with physical powers much weakened by sickness, and this may well have been the best method of maintaining his strength. We find in the record no evidence of fraud or undue influence. If it be said that the appellee Charles and his wife had an opportunity to use such influence because they

lived with him and cared for him, it is sufficient to say that that opportunity is not enough.

We have left then the question of mental unsoundness of Coyle, Sr. We refrain from extended comment upon the evidence, being content to set out in bare outline the evidence which seems to us sufficient to sustain the decree of the trial court. A fact proposition on conflicting evidence was presented. While appellants' testimony might have been sufficient to justify submission of the question to a jury were this a law action, this being in equity, the trial court must make the decision. A careful examination of the nearly 350 pages of abstract persuades us that the court was right in finding that appellants had not sustained the burden they assumed when they brought this suit.

Coyle, Sr., while hard of hearing for a number of years, seems to have been in good health until sometime about the early part of January, 1938. He suffered an attack of pneumonia induced, as his physician thought, by undue exertion and exposure sometime in that month. His health too was somewhat affected by the bad condition of his teeth which he declined to have attended to. From the time he was taken sick he gradually failed and died on the 18th day of March.

It was during this period that most of the incidents upon which appellants rely as showing mental unsoundness are alleged to have taken place. Most of the testimony offered by them is confined to members of their own family. It was testified to by them that their father didn't recognize some of them, that his eyes were glassy and staring, he mumbled and talked incoherently; on one occasion he directed that a bottle of whiskey be brought from a shelf though there was neither bottle nor shelf; he saw a billy goat against the wall and thought he saw a man standing by the stove when no such person was present; he inquired about the health of one who had died sometime before; and he spoke of weariness from having attended a wake of a person who was not yet deceased. He saw Kramer drunk in the home when Kramer wasn't there at all; on one occasion he bought candy for the children and forgot to pay for it; on another, he bought salt but didn't remember having done so. On another occasion he wanted to go home when he was already

there; and he upbraided a son-in-law for having entered into a contract for the rental of a farm which contract had not been made.

Appellants expressed the opinion that the father was of unsound mind, this over valid objection in nearly every instance because not confined to the testimony given. Appellants had homes of their own and hadn't the same opportunities for observation as had appellee and his wife. The latter saw none of the peculiarities set out above though they lived with Coyle, waited on him and saw him every day; neither did Mary Elizabeth Hall, a daughter.

Doctor Piekenbrock, a member of the Dubuque County Commissioners of Insanity, expressed the opinion, based on a hypothetical question, that Coyle was of unsound mind. He had never seen him, and based his opinion strictly on the assumption that everything contained in the hypothetical question was true.

Among the witnesses called by appellants was one McDermott who called at the home on February 25th. (It is to be remembered that the instruments were signed on March 4th though prepared on February 12th.) McDermott was there in connection with the soil conservation business and he expressed the view that he had difficulty in getting Coyle to understand the plan. This testimony lost much of its significance when he added on cross-examination:

"This farm program, I don't know whether I can make a lawyer understand that. It was a difficult program for anybody to understand."

We do not stop to refute the disparagement of our learned profession implicit in that statement.

This witness offered no opinion as to soundness of mind.

As against this, appellees offer the testimony of Doctor Luehrsmann who first was called to see Coyle on December 20, 1936, treated him several times during the year 1937, and visited him on January 17, 1938. He saw him on the 14th, 21st, 23d, 25th and 28th days of that month and on the 5th day of March. This was the day after the bill of sale and deed were executed. He visited Coyle on the 10th, 14th and 17th

days of March. Doctor Luehrsmann found him suffering from pneumonia accompanied by infection of the mouth and teeth. From and after the visit of the doctor on March 5th, Coyle grew gradually weaker until he died.

Doctor Luehrsmann expressed an unqualified opinion that Coyle was of sound mind from December 20, 1936, to March 14, 1938. He described him as a very determined individual with a strong mind rather than a weak one.

When challenged on cross-examination about the queer things the appellants said Coyle had done, the doctor explained that delirium in fever might cause the sick man to imagine things. In none of his visits did the doctor notice any peculiarities. In answer to a hypothetical question, he admitted, assuming that the things that were stated actually took place, that one would be led to think that the man was of unsound mind.

Mahoney, cashier of the bank at Farley, prepared the instruments which are challenged by this lawsuit. In compliance with an earlier request made by Hugh Coyle, Sr., that the banker prepare certain papers for him, Mahoney had gone out to the home on February 12th and prepared the instruments but they were not then signed nor acknowledged at that time because of a doubt in the mind of the banker whether execution on a legal holiday would be valid. He went back and took the acknowledgment on March 4th. Coyle gave as his reason for making said bill of sale and deed, rather than a will, that he wished to avoid the expenses of taking it through court. As a reason for giving everything to his son Charles, Coyle told Mahoney that Charles was thirty-five years of age and had never left the farm. The other children had gone out into the world for periods of from seventeen to twenty-four years.

On February 12th, according to this witness, Coyle was fully dressed and came to greet him. He sent the son Charles into another room to get some deeds from which the description of the property might be taken. He expressly excluded the forty acres which had belonged to his wife, saying that as she hadn't given it to him he had nothing to do with it. He talked intelligently and the banker saw nothing to suggest unsoundness or weakness of mind either then or when he came

back on March 4th to have the papers completed. Coyle had no difficulty in recognizing him and seemingly understood the transaction fully. The personal property, Coyle said, should go to his son Charles because he couldn't very well manage the farm without it.

On the 4th of March the banker went into the room and Coyle was sitting on the day bed. He got up, shook hands and talked about the condition of the roads. When asked if he had changed his mind about the instruments made out when there before, Coyle said "no" and that he wanted to sign them. The instruments were signed, placed in an envelope and held in escrow by the banker. It was the opinion of this witness. that at all times he knew Coyle, he considered him a man with a very keen, determined mind, knew what he wanted and was set in his ways. Mahoney had a definite opinion that Coyle was at all times of sound mind.

Goodale, a bookkeeper in the bank, who accompanied Mahoney on February 12th, noticed nothing irrational about Coyle's conversation. Coyle seemed to know what he was talking about.

Clem Ludorissy, who worked at the place in January and February, 1935, saw Coyle in January and February of 1938. On one of these occasions, Coyle, though in bed, promptly recognized him, called him by his first name and inquired about a relative of the witness who had recently undergone an operation. He testified that Coyle appeared to understand all that was said to him. In February Coyle was up and about the home; he appeared to understand what was said. He responded to everything that was said to him in the two hours the witness was present.

Hall, a hired man who worked on the farm from January 10, 1938, until after the old man died, saw him a number of times and was present when the banker and his helper were there. Coyle was dressed, ate his dinner at the table that day and needed no assistance from others.

About a month before Coyle died one Severn talked with him and his son Charles about a tractor. He talked with Coyle for perhaps two hours. This witness had known Coyle for

forty years, saw him and talked to him during the years and had many opportunities to judge of his mental character.

Sweeney, who had at one time worked in an oil station, knew Coyle for about five years and saw him in January of 1938. He had seen Coyle before that about once a week.

Hefel, a brother-in-law of appellee Charles, saw Coyle for the last time sometime in the early part of March. He was up and dressed and expressed the notion that it was unnecessary that the witness should have taken the trouble to bring back borrowed oats on roads as they were then. He appeared to understand what the witness was telling him and responded to what was said.

Henry Ludovissy, brother-in-law of Mrs. Charles Coyle, saw Coyle sometime in March, 1938. Coyle was then sick in bed but recognized the witness, called him by name and visited for fifteen or twenty minutes.

Tucker, who had known Coyle, Sr., ever since he could remember, saw him about two weeks before his death. He saw nothing wrong with the old man in his conversation or in his appearance.

None of the witnesses for appellees whose names have been given and some not mentioned saw or heard any of the peculiarities testified to in behalf of appellants, and all were of the opinion that Coyle was of strong and sound mind. Some of such opinions were not supported by extensive opportunities for observation, but in a number of instances fully as much and, in some, more than appellants' witnesses.

This opinion has already reached undue length and we refrain from a further discussion of the evidence. As we have said, only a fact question is before us. We are satisfied with the conclusion reached by the trial court. We purposely omit a discussion of the authorities cited by the parties because they announce only well-known principles of law.

Finding no error in the decree of the trial court, it is affirmed.—Affirmed.

CHIEF JUSTICE and all JUSTICES concur.